# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## AT HUNTINGTON

KIM TOMBLIN,                    :        Civil Action No. 3:08-CV-1294
                               :
            Plaintiff,          :        Honorable Robert C. Chambers
                               :
      v.                        :
                               :
WCHS-TV8,                       :
                               :
            Defendant.          :

## MEMORANDUM IN SUPPORT OF
## MOTION OF DEFENDANT SINCLAIR MEDIA III, INC.
## FOR SUMMARY JUDGMENT

Dated:  August 12, 2009                FROST BROWN TODD LLC


                                       James D. McQueen, Jr. (WV Bar # 2507)
                                       FROST BROWN TODD LLC
                                       Chase Tower, Suite 1200
OF COUNSEL:                            707 Virginia Street East
                                       Charleston, WV  25301-2705
Richard M. Goehler (Ohio Bar # 0009160)   (304) 345-0114
Patricia A. Foster (Ohio Bar # 0080306)   (304) 345-0115 (Facsimile)
FROST BROWN TODD LLC
2200 PNC Center
201 East Fifth Street
Cincinnati, Ohio  45202-4182
(513) 651-6711
(513) 651-6981 (Facsimile)

# TABLE OF CONTENTS

I.   STATEMENT OF UNDISPUTED MATERIAL FACTS.................................................1

    A.   Sinclair Broadcast News of an Official Investigation of Kim's Kids Daycare. ..........................................................................................................1

    B.   Kim's Kids Failed to Keep "Eyes On" in Violation of Parents' Trust. ..................4

    C.   Long Before Sinclair's Report, There Was a "Buzz" in the Community About Allegations of Abuse at Kim's Kids. ..........................................................6

    D.   Sinclair Broadcast Kim's Kids' Response to the Mother's Allegations. .................7

II.  ARGUMENT: THERE ARE NO GENUINE ISSUES OF MATERIAL FACT AND PLAINTIFF'S CLAIMS AGAINST SINCLAIR FAIL AS A MATTER OF LAW. ....................................................................................................8

    A.   Plaintiff's Claim for Defamation Fails as a Matter Of Law. ..................................9

        1.   Sinclair's News Report Was Truthful. ......................................................10

        2.   Sinclair Published Its News Report Without Fault. ...................................14

            a.   Sinclair's News Report Was Qualifiedly Privileged and Plaintiff Cannot Prove Actual Malice. .............................................14

            b.   Even If Not Privileged, Sinclair Was Not Negligent. ...................18

    B.   Plaintiff's Claim for False Light Invasion of Privacy Fails for Lack of Proof as to False Light and Actual Malice. ..........................................................18

    C.   Plaintiff's Claims for Emotional Distress Fail as a Matter of Law. ......................19

III. CONCLUSION .................................................................................................................20

## TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986) ................................................................9, 16

*Brown v. City of Fairmont,* 221 W. Va. 541, 569 (W. Va. 2007).................................................20

*Celotex v. Catrett*, 477 U.S. 317 (1986) .........................................................................................8

*Chafin v. Gibson*, 213 W. Va. 167 (W. Va. 2003)....................................................................9, 16

*Crump v. Beckley Newspapers, Inc.*, 173 W. Va. 699 (W. Va. 1983) ..................10, 14, 15, 16, 19

*Curran v. Amazon.com, Inc.*, 2008 U.S. Dist. LEXIS 12479 (S.D.W. Va. 2008) ........................19

*Friendship Empowerment and Economic Devlpmt, CDC, Ind., v. WALB-TV*, 2006 U.S. Dist. LEXIS 27785 (M.D. Ga. 2006)............................................................................................ 13

*Garrett v. Viacom, Inc.*, 2003 U.S. Dist. LEXIS 21007 (N.D. W. Va. 2003) ..............................20

*Harbolt v. Steel of W. Va., Inc.*, 2009 U.S. Dist. LEXIS 63131 (S.D. W. Va. 2009) ...................11

*Harte-Hanks Communications v. Connaughton*, 491 U.S. 657 (1989) .........................................17

*Havalunch, Inc. v. Mazza*, 170 W. Va. 268 (W. Va. 1981) .........................................14, 15, 16, 18

*Heldreth v. Marrs*, 188 W. Va. 481 (W. Va. 1992).......................................................................20

*Hinerman v. Daily Gazette Co.*, 188 W. Va. 157 (W. Va. 1992) ..................................................14

*Hupp v. Sasser*, 200 W. Va. 791 (W. Va. 1997)...............................................................10, 11, 12

*Hustler Magazine v. Falwell,* 485 U.S. 46 (1988) ........................................................................19

*Long v. Egnor*, 176 W. Va. 628 (W. Va. 1986) ......................................................................10, 11

*Maynard v. The Daily Gazette Co.*, 191 W. Va. 601 (W. Va. 1994)......................................10, 11

*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) ................................................................16

*Sarkissian v. W. Va. Univ. Bd. of Governors*, 2008 U.S. Dist. LEXIS 26365 (N.D. W. Va. 2008) ........................................................................................................................................10

*Serian v. Penguin Group (USA), Inc.*, 2009 U.S. Dist. LEXIS 63677 (N.D. W. Va. 2009) .........11

*Smith v. Reed*, 944 S.W.2d 623 (Tenn. App. 1996)..................................................................14, 15

*Susko v. Cox Enterprises, Inc.*, 2008 U.S. Dist. LEXIS 69901 (N.D. W. Va. 2008) ........11, 18, 19

*Suriano v. Gaughan*, 198 W. Va. 339 (W. Va. 1996)...................................................10, 11, 16, 17

*Swearingen v. Parkersburg Sentinel Co.*, 125 W. Va. 731 (W. Va. 1943)....................................15

*Washington Post Co. v. Keogh*, 365 F.2d 965 (D.C. Cir. 1966), *cert. denied*, 385 U.S. 1011 (1967)..........................................................................................................................9

*Williams v. Precision Coil, Inc.*, 194 W. Va. 52 (W. Va. 1995).....................................................9

*Wilson v. Daily Gazette Co.*, 214 W. Va. 208 (W. Va. 2003) ......................................................16

## I.     STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.     Sinclair Broadcast News of an Official Investigation of Kim's Kids Daycare.

On July 17, 2008, Defendant Sinclair Media III, Inc. ("Sinclair" or "WCHS") received a call from a mother ("Mother"), who stated that her child was abused sexually while at Kim's Kids Daycare.[1]  *Noreika Aff., ¶ 5.*  Sinclair's reporter, Elizabeth Noreika, was assigned to cover the story and she had a short telephone conversation with the Mother who said she was concerned and upset and agreed to a meeting.  *Id. at ¶ 6.*  Before meeting the Mother, Noreika called John Law, Communications Director of West Virginia's Department of Health and Human Resources ("DHHR").[2]  *Id. at ¶ 7.*  Mr. Law also agreed to be interviewed for a potential news report on Kim's Kids.  *Id.*

Noreika then met the Mother and interviewed her in person on July 17, 2008.  *Id. at ¶ 8.*  The Mother repeated her allegations that her child had been sexually abused while at the Daycare and expressed her opinion that Kim's Kids abused her trust and her child.  *Id.*  She supported her allegations by showing Noreika the DHHR's official investigative report into Kim's Kids, titled INVESTIGATION OF ALLEGED ABUSE OR NEGLECT IN CHILD CARE AGENCY ("DHHR Report").  *Id. at ¶ 9; Sperry Dep., Ex. 3D.*  According to the DHHR Report, it was alleged that a boy "touched [her child] inappropriately by sticking his finger into [her child's] rectum and grabbing [her child's] genitals."  *Noreika Aff., ¶ 10.*  The DHHR Report also documented numerous infractions discovered during the investigation including lack of supervision and smoking.  *Id.*  It detailed the Daycare's history of lack of supervision issues.  *Id.*

---

[1]     Kim's Kids (also referred to as "Daycare") is a sole proprietorship, owned by Kim and Billy Tomblin that was directed by Kim Tomblin ("Tomblin") during the relevant time period.  *K. Tomblin Dep., 15.*  Kim's Kids was the only licensed daycare in Barboursville.  *K. Tomblin Dep., 19.*

[2]     The DHHR regulates, investigates and licenses daycares in West Virginia.  For simplicity, Sinclair has not made distinctions between specific departments within DHHR or adopted the Tomblins' use of the phrase "Child Protective Services," but rather has attributed all activities and statements governed by this agency to the DHHR.

Finally, the DHHR Report concluded and summarized that, "Although a finding of child neglect cannot be made at this time, the possibility that such an incident could occur is likely." *Id.*

After the Mother's interview, Noreika spoke again with Mr. Law. *Id. at ¶ 11.* Noreika and the WCHS camera man then proceeded to Kim's Kids where they knocked on the door and were invited inside by an unidentified woman.[3] *Id. at ¶ 12; K. Tomblin Dep., 95:14-18.* This woman initially agreed to answer questions about the allegations, however, once inside, she refused, said the allegations were not true, and asked the reporter to leave. *Noreika Aff., ¶ 12-13; K. Tomblin Dep., 96:13-24; 97:2-22.* The reporter and cameraman exited the Daycare as requested, and subsequently, the cameraman shot video footage of the Daycare Center from across the street and from an adjoining property. *Noreika Aff., ¶ 13, 15; K. Tomblin Dep., 98:3-99:12.*

For the third time that day, Noreika called John Law while in the car in front of the Daycare. *Noreika Aff., ¶ 15.* She informed Mr. Law that the Daycare had refused to comment for the Report. *Id.* Mr. Law was the person who could verify on behalf of the DHHR the nature of the Mother's allegations concerning Kim's Kids. *Id.* Mr. Law knew of the allegations and knew how they would be reported. *Id.* Although he could not talk about the specifics because an appeal was pending, Mr. Law verified that the Daycare was under investigation. *Id.* Noreika collaborated so closely with Mr. Law on this report that she called him yet again once back at the TV station and read the entire Report for his approval. *Id. at ¶ 16.* Law approved the script exactly as written, saying that "he was fine with it." *Noreika Dep., 38:15-16; Noreika Aff., ¶ 16.*

Not only did Mr. Law expressly approve the script by telephone, he later personally came to the TV station on July 17, 2008 and watched the complete video of the news Report before it was broadcast. *Noreika Aff., ¶ 17.* Upon watching it, he had no questions about any of the

---

[3]     The woman was Plaintiff who opened the door to Noreika without identifying herself. *Noreika Aff., ¶ 24.*

statements in the Report and raised no concerns about whether the Report fairly and accurately reflected the DHHR Report or the allegations of abuse at Kim's Kids. *Id.* His response to watching the full Report was to approve it in its entirety by indicating that he was fine with it as it would be broadcast. *Id.* In addition, another Sinclair reporter and its news director also reviewed and approved the report before it aired. *Id. at ¶ 18.*

The Report focused on the DHHR investigation and licensing issues facing Kim's Kids, the only licensed daycare in Barboursville. *Id. at ¶ 21.* The investigation and licensing status of Kim's Kids is a legitimate matter of public interest. *Id.; Chambers Dep., 36:4-37:21.* The point of the Report was to let people know that Kim's Kids Daycare was investigated by the DHHR following a mother's allegations of abuse that occurred at the Daycare. *Noreika Aff., ¶ 20.* The fact of the Mother's allegations was important to the Report because those allegations prompted the investigation that impacted the licensing status of Kim's Kids. *Id.* The fact that the alleged abuse occurred in the Daycare was important to the Report because the Daycare is responsible for all activities that occur there. *Id.* However, the specifics of the allegations were unimportant to the Report, therefore they were characterized in nature only and the Report did not identify or describe the people involved or the specific acts alleged. *Id.; Chambers Dep., 45:1-46:9.*

The Report as broadcast described that "the State is investigating a daycare," and referenced "serious allegations of abuse and neglect." *Exhibit C to Motion (K. Tomblin Dep., Ex. 10); DVD-1 (hereinafter referred to jointly as DVD-1); Noreika Aff., ¶ 22.* It described the nature of the Mother's allegations in the DHHR Report, stating, "She alleges her son was sexually abused while at Kim's Kids Child Care." *Id.* It also stated that the Mother removed her children from Kim's Kids and believed the Daycare "abused her trust and her child." *Id.; Chambers Dep., 47:11-48:2.* Although the Daycare refused a reasonable opportunity to respond

3

to the allegations, Sinclair made a best effort to provide both sides of the story by reporting that Kim's Kids said, "any and all allegations aren't true." *Noreika Aff., ¶ 14, 24; DVD-1.* The Report went on to incorporate video footage of the interview with Mr. Law in which he described the DHHR's decision to refuse Kim's Kids' license. *DVD-1.* Mr. Law also explained that DHHR was working closely with Kim's Kids on unspecified problems. *Id.* Making clear that the DHHR investigation found no abuse or neglect by Kim's Kids, the Report expressly stated that "A spokesman for the Department of Health & Human Resources says an investigation has only turned up signs of worker inattentiveness, but DHHR says it was enough to close the facility." *Id.* Further, Sinclair reported that Kim's Kids remained open during its appeal and that the DHHR instructed Kim's Kids to accept no new children during the appeal. *Id.; Chambers Dep., 21:3-22:12.* Sinclair broadcast the Report without significant variation at 10:00 p.m. and 11:00 p.m. on July 17, 2008. *Noreika Aff., ¶ 14.*

### B. Kim's Kids Failed to Keep "Eyes On" in Violation of Parents' Trust.

As indicated in Sinclair's Report, on July 1, 2008, DHHR decided to withhold Kim's Kids' license renewal based on prior surveys and issues. *DVD-1.* In fact, in 2006 and 2007, DHHR issued corrective action plans for Kim's Kids in conjunction with repeated violations that affected the health and safety of children.[4] *K. Tomblin Dep., 43:16-44:23.* Following its investigation into the Mother's allegations, DHHR ordered Tomblin to close Kim's Kids completely by July 15, 2008.[5] *Sperry Dep., Ex. 3B. K. Tomblin Dep., 82:6-11, 83:4-11; 86:22-*

---

[4]      A prior DHHR investigation found significant violations and a pattern of children being left unsupervised such that alleged abuse was likely. *Sperry Dep., 13:8-25, Ex. 3 Investigation of Alleged Abuse or Neglect in Child Care Agency, February 12, 2007 at 4.* In 2008, Kim's Kids operated under a provisional license indicating concerning safety issues that required corrective action. *K. Tomblin Dep., 46:3-16; Sperry Dep., 27:12-15; Chambers Dep., 9:17-24.* Yet, by June 2008, Kim's Kids committed additional instances of non-compliance relating to health and safety. *Sperry Dep., Ex. 4, History of Non-Compliance Report at 10-13.*

[5]      The DHHR informed Tomblin that she could not enroll new children pending a hearing on her license. *Sperry Dep., Ex. 3F at 4-5; Chambers Dep., 22:2-6.* The DHHR State Hearing Officer, finding a clear pattern of uncorrected violations involving supervision and physical safety, concluded that Tomblin's repeated violations

*87:4.* DHHS ordered Tomblin to advise parents of the Daycare's status, and Tomblin did so. *Id.* DHHS determined that Kim's Kids "is unable or unwilling to properly supervise children in accordance with child care center regulation." *Sperry Dep., 43:24-44:4, Ex. 3B at 1.*

As Director of Kim's Kids, "the buck stopped" with Tomblin, making her responsible for enforcing regulations that required adequate supervision of children.[6] *K. Tomblin Dep., 31:21-33:2.* Adequate supervision amounts to "eyes on,"[7] a standard that requires Kim's Kids to watch each child "the whole entire time they're at the center." *K. Tomblin Dep., 35:2-9, 36:14-22; 214:19-215:3.* Yet, According to both public records and Plaintiff's testimony, Kim's Kids failed to keep "eyes on" the children. *K. Tomblin Dep., 35:14-20; 43:16-44:23; 45:17-46:21; Sperry Dep., 55:1-6; Chambers Dep., 13:3-14:23.*

According to the DHHR, the Mother's allegations that prompted its investigation into Kim's Kids in June 2008 involved contact of a sexual nature that could have been prevented or prohibited by "eyes-on" supervision. *Sperry Dep., 66:21-67:17.* When faced with allegations like the Mother's, the DHHR looks to the adults in charge because it does not name children as perpetrators of abuse. *Sperry Dep., 66:13-20.* The DHHR's focus on the adults at Kim's Kids to answer for allegations that one child inappropriately touched another did <u>not</u> indicate that a staff member was accused of the touching. *Sperry Dep., 104:9-24; Chambers Dep., 15:6-18.*

Consistent with DHHR's focus on the adults in charge, Plaintiff admitted the Daycare's responsibility for harm, potential harm, abuse or neglect of any child at Kim's Kids "<u>whether</u>

---

posed a risk to children. *Sperry Dep., Ex. 3A at p.11-12, ¶ 3.* Kim's Kids contested the ruling by the administrative law judge and it was recently overturned on a finding of insufficient evidence in the record to substantiate a material violation. Although immaterial to the facts or issues related to Sinclair's Report on July 18, 2008, Sinclair has continued to follow the licensing status of Kim's Kids as a legitimate matter of public concern.

[6]   Similarly, a DHHR regulation forbade smoking anywhere on Kim's Kids premises and Plaintiff was ultimately responsible for complying with that regulation. *K. Tomblin Dep., 36:23-37:11*

[7]   "Eyes-on supervision" is defined by DHHR as "observation, oversight, and guidance of the individual child or groups of children, by the staff member . . . close enough to intervene, if necessary, to protect the child from harm." *Sperry Dep., 30:6-20, Ex. 4 at p.6 History of Non-Compliance Report.*

[it's] ultimately done by a staff member or another child[.]" *K. Tomblin Dep., 216:16-217:5; Chamber Dep., 35:17-36:3.* Parents should <u>expect</u> Kim's Kids to protect each child from any inappropriate sexual touching at Kim's Kids <u>by anyone</u>. *K. Tomblin Dep., 215:4-13; 216:9-217:12.* Lack of supervision or any violation by the Daycare that puts a child in harm's way or an unhealthy situation violates the relationship of trust that exists between the Daycare and the parents who placed their children in the custody of Kim's Kids. *Id.; Chambers Dep., 35:2-36:3.*

### C.     Long Before Sinclair's Report, There Was a "Buzz" in the Community About Allegations of Abuse at Kim's Kids.

The publically available DHHR Report that was depicted in Sinclair's Report was drafted on June 10, 2008. *Sperry Dep., Ex. 3D, Sperry Dep., 41:2-6.* A few weeks before the Mother contacted Sinclair about the DHHR Report, she obtained copies of it and distributed them at her place of employment, St. Mary's Hospital. *K. Tomblin Dep., 50:9-19, 67:17-20.* Parents with children at Kim's Kids learned of the alleged abuse from this distribution, directly from the Mother, and from widely circulated email from an unknown source that alleged "sexual abuse was going on at Kim's Kids Child Care." *K. Tomblin Dep., 51:12-52:12; 66:7-25, 102:16--104:22; 105:23-106:2.*

Thus, talk of the allegations and investigation at Kim's Kids effectively created a "buzz" and was known to all staff members, all parents but one,[8] and the community generally before July 17, 2008. *K. Tomblin Dep., 62:17-25, 87:6-24, 116:13-117:21, 153:20-154:5; 159:3-11.* According to Plaintiff, that "buzz" caused parents to withdraw their children from Kim's Kids <u>before July 1</u>[st]. *K. Tomblin Dep., 87:6-24, 88:5-20.* DHHR cited the public trust and made no

---

[8] According to Tomblin, that one, Sarah Miles, obtained the DHHR Report directly from the DHHR, notified the Daycare of her decision to withdraw her children before July 17, 2008, and never saw Sinclair's Report. *K. Tomblin Dep., 160:8-10; 169:8-11; 181:2-21.* Yet, Tomblin's testimony about Sarah Miles is most notable for its direct and self-serving contradictions about when and how Miles withdrew her children. *Compare K. Tomblin Dep., Id.; 240:8-15, 241:1-12* (Tomblin contradicted her own sworn testimony after a break but without referencing any additional facts). Tomblin cannot create a factual dispute by contradicting herself in order to defeat a motion for summary judgment.

apology for its public investigation and action upon allegations of child abuse at Kim's Kids. *Sperry Dep., Ex. 3, Provider Contact Report From 7/23/08 – 8/1/08 at 1.*

### D.      Sinclair Broadcast Kim's Kids' Response to the Mother's Allegations.

On July 17, 2008, Tomblin knew of the "buzz" alleging sexual abuse at Kim's Kids and DHHR's investigation and decision to withhold her license.  Yet, when Sinclair's reporter, Elizabeth Noreika, offered Tomblin a reasonable opportunity to respond to these facts and allegations, Tomblin refused.  *K. Tomblin Dep., 96:13-24; 97:2-22; Noreika Aff., ¶ 24.*  Even as she did so, Tomblin believed Sinclair's Report on this topic would be broadcast that evening.  *K. Tomblin Dep., 110:6-9.*

Only after the Report was broadcast as anticipated did the Daycare decide to provide its side of the story.  *K. Tomblin Dep., 125:15-126:24.*  Billy Tomblin, Kim's Kids' co-owner, contacted Sinclair on July 19, 2008, and Sinclair immediately invited him to come in for an on-camera interview.  *Noreika Aff., ¶ 29.*  Sinclair aired Billy Tomblin's follow-up interview as its top story at 6:00 p.m., 10:00 p.m., and 11:00 p.m. on July 19, 2008.  *Id.; DVD-2.*  Billy Tomblin had a full opportunity to give the Daycare's position in response to the allegations and he was confident that he said what he needed to say to clarify that the allegations did not involve a member of the Daycare's staff.  *K. Tomblin Dep., 127:18-129:3, 130:17; B. Tomblin Dep., 56:23-57:24, 59:12-60:4, 66:11-20, 72:13-23, 73:16-22, 84:22-24.*[9]  The Tomblins believed the follow-up broadcast was fair and that Billy Tomblin did "an excellent job" to "clear [their] names" and "save face."  *K. Tomblin Dep., 128:2-3, 130:8-20., 206:6-22, 220:9-24.*

---

[9]      Beyond these undisputed facts, Billy Tomblin's testimony stands for little apart from his willingness to vacillate between fact and self-serving fiction.  *Compare B. Tomblin Dep., 18:7-20:25, 31:15-18, 41:3-6; 43:2-22; 78:4-81:1; 124:7-125:12* (Contrary to undisputed fact and his own testimony, Billy Tomblin blamed Sinclair's report as the first he or his wife ever heard of the Mother's allegations.  He also testified to countless variations as to the number of children supposedly removed from the Daycare before and/or after Sinclair's Report.).

The Tomblins demanded nothing else of Sinclair, and as apparent from Kim's Kids' records, the Daycare suffered no harm whatsoever from Sinclair's broadcast on July 17, 2008. *B. Tomblin 84:22-24.*   In general, Kim's Kids had between 32 and 35 full and part time children enrolled for daycare. *K. Tomblin Dep., 18:1-13.*   As sworn by Plaintiff under oath, Kim's Kids was at full capacity with 35 full and part time children enrolled in the fall of 2008 after Sinclair's broadcast.[10]   *K. Tomblin Dep., 30:3-31:11.*   The record also demonstrates that Kim's Kids' revenue grew, not shrank, after Sinclair's Report on July 17, 2008.[11]   *K. Tomblin Dep., Ex. 6.*   In addition, despite Plaintiff's strained contention that the Report accused Daycare staff of inappropriately touching the Mother's child, Billy Tomblin testified that, to his knowledge, no one believed that a member of Kim's Kids' staff had "done the abusing" after seeing Sinclair's broadcast on July 17, 2008. *B. Tomblin Dep., 97:20-22, 105:19-22, 107:1-4, 108:10-14.*

## II.   ARGUMENT: THERE ARE NO GENUINE ISSUES OF MATERIAL FACT AND PLAINTIFF'S CLAIMS AGAINST SINCLAIR FAIL AS A MATTER OF LAW.

Summary judgment must be granted where, as here, the totality of evidence, with all reasonable inferences favoring the non-moving party, fails to present a genuine issue of material fact that would lead a rational trier of fact to find for the non-moving party. FED. R. CIV. P 56(c); *Celotex v. Catrett*, 477 U.S. 317, 327 (1986).   Summary judgment is not a disfavored procedural shortcut, but a mechanism "designed to secure a just, speedy, and inexpensive determination of any action." *Id.*   A court must grant summary judgment against a party who fails to show, with specific facts beyond the pleadings, the existence of every essential element to its case where it

---

[10]      Plaintiff admitted that children left Kim's Kids by July 1st following the "buzz" about allegations of sexual abuse and Plaintiff has no first-hand knowledge of any child being removed from Kim's Kids as a result of Sinclair's Report on July 17th. *K. Tomblin Dep., 87:6-88:20.*

[11]      Kim's Kids anticipates fewer children in the summer months as families travel for summer vacation, and Plaintiff traditionally shuts the Daycare for one full week during which time it receives no revenue. *K. Tomblin Dep., 23:8-16; 27:1-21.*   In 2008, Kim's Kids commenced its vacation on July 21, 2008, thus Kim's Kids was closed and expected no revenue for the full week immediately following Sinclair's Report. *K. Tomblin Dep., Ex. 2 at July 2008.*   Once it reopened after vacation, Kim's Kids' revenue increase from July to August 2008 and increased again from August to September 2008. *K. Tomblin Dep., Ex. 6.*

will bear the burden of proof at trial.  *Id.* at 322-24; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  When there is no dispute as to the salient facts, summary judgment acts as a necessary safeguard that isolates and disposes of meritless claims without resort to lengthy and expensive litigation.  *Williams v. Precision Coil, Inc.*, 194 W. Va. 52, 58-59 (W. Va. 1995). "The question whether the evidence in the record in a defamation case is of the convincing clarity required to strip the utterance of First Amendment protection is not merely a question for the trier of fact." *Chafin v. Gibson*, 213 W. Va. 167, 173 (W. Va. 2003).  Thus, West Virginia expressly requires judges to utilize their powers through summary judgment to prevent meritless claims that might become tools for harassment or coercion.  *Id.* at 174; *see also Washington Post Co. v. Keogh*, 365 F.2d 965, 968 (D.C. Cir. 1966), *cert. denied*, 385 U.S. 1011 (1967).[12]  By law, the press must be afforded substantial protection from litigation such that true freedom of the press may be realized both in theory and in practice.  *Chafin*, 213 W. Va. at n.8.  "Freedom of the press" cannot be trumped by a plaintiff's frustration over unflattering, or even false reporting that does not meet every stringent element of a defamation claim.  *Id.*  Therefore, summary judgment is the rule, rather than the exception, in cases like this one against media defendants.[13]

### A.      Plaintiff's Claim for Defamation Fails as a Matter Of Law.

Under West Virginia law, a defamation plaintiff has an onerous burden to prove: (1) a defamatory statement of fact; (2) a nonprivileged communication to a third party; (3) falsity; (4)

---

[12]      Exhibit 1 attached to the Motion contains a copy of the unreported and out-of-state cases cited herein. According to this authoritatively recognized case:

> In the First Amendment area, summary procedures are even more essential.  [At] stake here, if harassment succeeds, is free debate . . . .  Unless persons . . . desiring to exercise their First Amendment rights are assured freedom from the harassment of lawsuits, they will tend to become self-censors.  And to this extent debate on public issues . . . will become less uninhibited, less robust, and less wide-open, for self-censorship affecting the whole public is "hardly less virulent for being privately administered."

[13]      Media defendants won 82.0 percent of summary judgment motions, and won partial summary judgment in an additional 6.4 percent of reported federal and state cases between 2001 and 2006.  *Summary Judgment Study*, MLRC Bulletin, 2007, Issue No. 2 Part B, 15 (September 2007).

reference to the plaintiff; (5) the requisite degree of fault by the defendant in failing to publish the truth about the plaintiff; and (6) resulting injury. *Crump v. Beckley Newspapers, Inc.*, 173 W. Va. 699, syl. pt. 1, n.3 (W. Va. 1983). As a matter of law, truth and privilege provide absolute defenses against a claim of defamation. *Id.* at 706; *Sarkissian v. W. Va. Univ. Bd. of Governors*, 2008 U.S. Dist. LEXIS 26365 (N.D. W. Va. 2008).

In this case, Plaintiff's claim for defamation fails as a matter of law on the basis of two separate legal arguments. Specifically, Plaintiff cannot prove a false statement of fact because Sinclair's news report was true. Additionally, Plaintiff cannot prove that Sinclair published any statement with the requisite degree of fault.[14] For these independent reasons, Plaintiff's claim for defamation premised upon Sinclair's truthful news report fails as a matter of law.

### 1.    Sinclair's News Report Was Truthful.

As a matter of law, the truth of allegedly defamatory words or phrases must be evaluated within the context in which they were published. *Hupp v. Sasser*, 200 W. Va. 791, 798 (W. Va. 1997); *Long v. Egnor*, 176 W. Va. 628, 637 (W. Va. 1986). If a challenged statement cannot be proved false, then a claim for defamation must be dismissed for failure to establish a crucial element, falsity. *State ex rel. Suriano v. Gaughan*, 198 W. Va. 339, 354-55 (W. Va. 1996). To determine falsity as a matter of law, statements must be considered with a view to the speaker's knowledge and understanding of the words used. *Id.* Plaintiff has the burden to prove falsity, and a defamation defendant has no burden to prove the literal truth of every statement in every detail. *Maynard v. The Daily Gazette Co.*, 191 W. Va. 601, 604 (W. Va. 1994). As a matter of law, minor inaccuracies do not amount to falsity if the substance, gist or sting of the challenged

---

[14]    As described herein, Plaintiff's claim fails for lack of falsity and fault. Additionally, according to Kim's Kids' records, the Daycare suffered no damage as a result of Sinclair's Report on July 17, 2008. *See Sec. I.D. supra.*

statements is justified.  *Suriano*, 198 W. Va. at 352.  Therefore, <u>substantially true</u> statements are absolutely protected speech.  *Id.*

A statement that "there were allegations . . . " is <u>true</u> if there were, indeed, such allegations.  *Harbolt v. Steel of W. Va., Inc.*, 2009 U.S. Dist. LEXIS 63131, *45 (S.D. W. Va. July 6, 2009).  A statement characterizing allegations by their nature cannot provide the basis for a defamation claim if the allegations were made and if their substance bears out the depiction. *Hupp*, 200 W. Va. at 798 (college dean's report of a graduate assistant's "alleged 'abusiveness' and 'unprofessional behavior'" was true although it boiled students' complaints down to just a few words that both paraphrased and eliminated detail).  Additionally, because not provable as false, subjective comments and statements of opinion are not actionable.  *Id.*; *Maynard*, 191 W. Va. at 603; *Serian v. Penguin Group (USA), Inc.*, 2009 U.S. Dist. LEXIS 63677, *24-25 (N.D. W. Va. 2009); *Susko v. Cox Enterprises, Inc.*, 2008 U.S. Dist. LEXIS 69901 (N.D. W. Va. 2008) (allegations are protected opinion if different individuals would assign a different threshold for them).  Whether a statement comprises protected opinion or verifiable fact is a question of law. *Long*, 176 W. Va. at 638.

In this case, Sinclair reported truthful, verifiable facts as follows: (1) the Mother alleged to DHHR that her son was abused sexually while at Kim's Kids and she removed her children from the Daycare; (2)  Kim's Kids was investigated by DHHR and that investigation turned up nothing except for signs of worker inattentiveness; (3) however, because of the outcomes of DHHR surveys, the department decided not to renew Kim's Kids' license; and (4) the licensing issue was under appeal allowing Kim's Kids to stay open, but unable to accept new children according to a DHHR spokesman.  *DVD-1*

Plaintiff cannot prove, as is her burden, that any factual statement in Sinclair's report was false. The Mother did in fact allege that her child was sexually abused while at Kim's Kids and she did in fact remove her children from Kim's Kids. *K. Tomblin Dep., 48:19-23, 213:2-14.* The DHHR's investigative report and official documents demonstrate that allegations in the nature of those reported were in fact made. *Sperry Dep., Ex. 3D.* An official state investigation ensued. *Id.* That investigation only found signs of inattentiveness as reported. *Id.* Yet, DHHR withheld Plaintiff's license exactly as described. *Id.* At *Ex. 3B.*

Plaintiff also cannot prove, as is her burden, that Sinclair *insinuated* false, defamatory, factual information about her. Plaintiff claims that, while nothing in Sinclair's Report accused daycare workers of the alleged sexual abuse, the Report insinuated as much by omitting details of the accused.[15] *K. Tomblin Dep., 208:21-209:4; Complaint, ¶42.* However, Sinclair's Report, when read in its entirety and in context as required by law is incapable of this insinuation. *Noreika Aff., ¶ 28; See Hupp*, 200 W. Va. at 798. The Report expressly exonerated Kim's Kids from any finding of wrongdoing connected with the DHHR investigation into the Mother's allegations apart from worker inattentiveness. *Id.*; *DVD-1.* Sinclair cannot insinuate that Kim's Kids was culpable of sexual abuse while expressly stating that it was not. As a matter of law, Plaintiff cannot cherry pick words or phrases from the entire broadcast to argue otherwise.

Nor can Plaintiff premise her claim for defamation on statements within Sinclair's Report that must be classified as opinion. For example, the Mother described herself as angry and supposed that her son may be "scarred for life." Supported by the facts in the disclosed official DHHR investigation, the Mother believed that the Daycare "abused her trust and her

---

[15]     Sinclair characterized the nature of Mother's allegations without identifying or describing the people involved or the specific acts alleged. Noreika Aff., ¶ 20. The specifics were unimportant to the Report. *Id.* However, the fact of the allegations was important to let people know that the resultant investigation impacted the licensing status of the only licensed daycare in Barboursville. *Id.*

child." *DVD-1*.  Not only were these statements opinion, by Plaintiff's admission, that opinion was justified in that parents had a right to <u>expect</u> there to be <u>no</u> inappropriate sexual touching <u>by anyone</u> at the Daycare.  *K. Tomblin Dep., 217:8-12*.

In a similar case to the case at bar, a television station was granted summary judgment for broadcasting an accelerated surveillance tape supplied by a mother along with her allegations that the tape showed her child being abused at a daycare.  *See Friendship Empowerment and Economic Devlpmt, CDC, Ind., v. WALB-TV*, 2006 U.S. Dist. LEXIS 27785, *11-14 (M.D. Ga. 2006).  Although the report was somewhat less than a complete report of the truth, it was determined to be substantially accurate.  *Id.* at *8.  In fact, as reported in a follow-up broadcast, the sheriff's department subsequently viewed the tape in real time and concluded that it showed no child abuse.  *Id.* at *2-3.  Yet, because the mother's allegations of abuse were her opinion based on the tape, the daycare could prove no falsity, therefore, no defamation.  *Id.* at *12-14.

Just as in *Harbolt*, Sinclair stated truthfully that allegations were made.  Just as in *Hupp*, Sinclair accurately characterized those allegations by describing their nature without providing every detail.  *Chambers Dep., 10:11-24.*  Also, as in *Hupp*, this Court must consider the context of challenged words or phrases such that Plaintiff cannot claim an *insinuation* that was dispelled by the entirety of Sinclair's Report.  Just as in *Friendship Empowerment and Economic Devlpmt, CDC, Inc.*, Sinclair is absolutely protected for airing the Mother's opinion that her child was abused based on her interpretation of the disclosed facts.  In sum, Sinclair's Report contained substantially true facts and opinion premised on disclosed facts.  Plaintiff cannot prove falsity, therefore, the enquiry into Plaintiff's defamation claim requires nothing further and must be dismissed as a matter of law.

### 2.      Sinclair Published Its News Report Without Fault.

Regardless of the fatal lack of proof of falsity, Plaintiff's defamation claim must also fail for the independent reason that Plaintiff lacks proof that Sinclair acted with fault.  A defamation plaintiff must prove that the defendant published a false statement with fault, either actual malice or negligence.  *Havalunch, Inc. v. Mazza*, 170 W. Va. 268, 271 (W. Va. 1981).

### a.      Sinclair's News Report Was Qualifiedly Privileged and Plaintiff Cannot Prove Actual Malice.

Sinclair's Report was a fair report of official acts and statements involving a matter of public concern, therefore Sinclair made its Report with two distinct qualified privileges.  Plaintiff has the onerous burden to prove that Sinclair published false statements of fact with constitutional actual malice in order to overcome these qualified privileges.  *See Crump*, 173 W. Va. at 707.  There is no dispute of material fact, therefore the existence of privilege presents a question of law for the court.  *Crump*, 173 W. Va. at 710.

"There is a privilege under the First Amendment for fair and accurate reporting on official proceedings.  Though some of the facts asserted in an official proceeding may be untrue, the media is not liable for reporting them."  *Hinerman v. Daily Gazette Co.*, 188 W. Va. 157, 187 (W. Va. 1992) (Miller, J., dissenting).  Likewise, a regular news account that sets forth one-sided allegations is not actionable as it gives notice that unsubstantiated allegations are being reported.  *Crump*, 173 W. Va. at 175.  The fair report privilege protects reports of official actions or proceedings that are accurate, complete, or a fair abridgement of the occurrence reported.  *Hinerman*, 188 W. Va. at 174-75.  Thus, the fair report privilege does not require a verbatim recitation, technical accuracy, or proof of the underlying allegations reported.  *See id; Smith v. Reed*, 944 S.W.2d 623 (Tenn. App. 1996) (newspaper awarded summary judgment for its report that characterized allegations of child abuse at a daycare although charges were dismissed

following a preliminary hearing).  Rather, it protects reporting that provides a fair and just impression of official proceedings and statements.  *Id.*

Additionally, a distinct qualified privilege protects Sinclair's Report as a fair comment on matters of public concern.  *Crump*, 173 W. Va. at 708.  Fair comment is a qualified privilege applied to the news media for discussing matters of legitimate concern to its community. *Havalunch, Inc.*, 170 W. Va. at 272-73.  The media has a duty to make known matters related to government action and the welfare of citizens, and that duty gives rise to the fair comment privilege.  *Swearingen v. Parkersburg Sentinel Co.*, 125 W. Va. 731, 744 (W. Va. 1943).

In this case, as a matter of law, Sinclair's news report was both a fair report of official action and a fair comment on a matter of public concern.  The State of West Virginia documented the Mother's allegations that her child was sexually abused at Kim's Kids.  *Sperry Dep., Ex. 3E at II.*  The official DHHR Report also documented allegations of smoking and other inappropriate behavior by Daycare staff such as leaving the children unsupervised and unattended.  *Id. at III.B-C.*  Finally, the official report summarized, "Although a finding of child neglect cannot be made at this time, the possibility that such an incident could occur is likely." *Id. at III.E.*  Not only did Sinclair fairly and accurately report on the DHHR's Report, it sought and incorporated official statements from DHHR.  DHHR verified that allegations were made against Kim's Kids and confirmed that the allegations were of the nature reported.  *Noreika Dep., 22:1-20; 23:12-23; 79:19-80:4.*  Further, Sinclair obtained DHHR's express approval for its Report exactly as broadcast.  *Noreika Dep., 33:9-11, 37:10-40:22; 72:4-15.*  Therefore, Sinclair's Report was qualifiedly privileged as it fairly depicted official actions and statements.

It is also uncontested that the point of Sinclair's report involved a legitimate matter of public interest - an official investigation that affected Kim's Kids' license.  *Noreika Aff., ¶ 21.*

Plaintiff positioned herself as the only licensed daycare in Barboursville, making any threat to her licensed status especially important to her community. *K. Tomblin Dep., 19.* The DHHR was publically involved in investigating and acting upon allegations of abuse at Kim's Kids. *Sperry Dep., Ex. 3, Provider Contact Report From 7/23/08 – 8/1/08 at 1.* DHHR's mandate to protect children by investigating allegations of abuse and its licensing decisions were obviously a matter of public concern. *Id.* Therefore, there can be no question but that Sinclair's news report describing an official DHHR investigation and the licensing status of Kim's Kids was qualifiedly privileged as a fair comment on a matter of public concern.

To overcome either of these qualified privileges, Plaintiff must show that Sinclair broadcast its news report with constitutional actual malice.[16] *Crump*, 173 W. Va. at 707. That is, Plaintiff must prove <u>by clear and convincing evidence</u> that defamatory statements were made with knowledge that the statements were false or with reckless disregard of whether they were false or not. *Suriano*, 198 W. Va. at 346 (emphasis added). Importantly, both the West Virginia Supreme Court and the United States Supreme Court require that a plaintiff prove actual malice by clear and convincing evidence, even at the summary judgment stage. *Id.* at 172-74; *Anderson*, 477 U.S. at 255-256. The element of actual malice must be decided on summary judgment unless the record contains evidence of convincing clarity that is required to strip the challenged utterance of First Amendment protection. *Chafin*, 213 W. Va. at 173.

---

[16]     Additionally, independent of the privileges described herein, the status of a defamation plaintiff as a public figure requires proof of actual malice. *Suriano*, 198 W. Va. at 346; *Wilson v. Daily Gazette Co.*, 214 W. Va. 208, 213 (W. Va. 2003). In West Virginia, "a person who, . . . by adopting a profession or calling which gives the public a legitimate interest in his doings, his affairs and his character, has become a public personage." *Crump*, 173 W. Va. at 712 (internal quotation omitted, emphasis added). As apparent from the face of Sinclair's broadcasts, Kim's Kids, not Kim Tomblin, was the subject of the challenged news reports, therefore, whether Kim Tomblin is a proper plaintiff in this case is not conceded. If she is, it is also clear that in this context she is also a public figure. Tomblin's profession made her accountable for the safety, health and welfare of children in her community. Therefore, assuming she has standing in this case, she must prove actual malice as a public figure. *Suriano*, 198 W. Va. at 346 (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964)). Likewise, Kim's Kids that sought to become the only licensed daycare in Barboursville and advertised its services to the community would be considered a public figure under West Virginia law. *See Havalunch, Inc.,* 170 W. Va. at 271.

Actual malice involves total disregard for the truth, not ill-will toward the plaintiff. *Suriano*, 198 W. Va. at 347.  There must be <u>evidence</u> of actual malice at the time of publication. *Id.*  Reliance upon seemingly reliable and accurate information negates any proof of actual malice, even if additional research might have revealed errors in the information reported.  *Id.*; *Harte-Hanks Communications v. Connaughton*, 491 U.S. 657, 688 (1989).

In this case, Plaintiff cannot point to any evidence, much less clear and convincing evidence, that Sinclair published specific false statements with actual malice.  Sinclair's reporter interviewed the Mother, attempted to interview the Daycare, read the investigative report of the DHHR, and conferred with the DHHR at least five times as she sought to verify the facts.  The DHHR expressly approved of the script and the video before the broadcast.  Although Plaintiff refused to provide her side of the story for inclusion in the Report, Sinclair clearly enunciated Plaintiff's position that any and all allegations were false.  Sinclair expressly described that the DHHR investigation into the allegations turned up nothing but signs of worker inattentiveness. As soon as Plaintiff decided to share the Daycare's side of the story, Sinclair interviewed her husband and featured that interview as its top story in three separate broadcasts.  Plaintiff admitted that she could have provided these same comments for the July 17th Report to "clear her name" but she chose not to do so.

Thus, when Sinclair broadcast its news report regarding Kim's Kids and its licensing issues, it had no knowledge, doubt, suspicion, nor any reason to suspect that any statements in its reports regarding the Daycare or the Plaintiff were false.  In fact, none were.  Sinclair relied upon the DHHR's express affirmation that the broadcast was "fine."   Plaintiff's claims must be dismissed as a matter of law for lack of any evidence that Sinclair acted with actual malice.

**b.      Even If Not Privileged, Sinclair Was Not Negligent.**

As demonstrated above, as a matter of law this Court must apply the fair report and fair comment privileges, and therefore the actual malice standard of fault to Plaintiff's defamation claim against Sinclair.  However, even without the privileges, Plaintiff's claim still fails as a matter of law for lack of any evidence that Sinclair acted with a lesser degree of fault – negligence.  *Havalunch, Inc.,* 170 W. Va. at 273-74 (a reporter who issued a harsh opinion was not negligent because she reasonably formulated her opinion from the facts).

In this case, by Plaintiff's own standards, Sinclair acted reasonably.  Plaintiff admitted that she would expect no more from a reasonable reporter than to talk to the Mother, talk to the DHHR, read the DHHR Report, and seek comment from the Daycare.  *K. Tomblin Dep., 203:7-23.*  That is precisely what Sinclair did.  In fact, Sinclair went further in that it conferred with the DHHR at every possible stage and received pre-broadcast approval for the Report as scripted.  *Noreika Dep., 18:19-23:9;37:10-40:22.*  Sinclair was entitled to rely on the information provided by official sources.  Plaintiff cannot point to any evidence to demonstrate that Sinclair was negligent; therefore, even by the most lenient standard, Plaintiff's claim fails as a matter of law.

**B.      Plaintiff's Claim for False Light Invasion of Privacy Fails for Lack of Proof as to False Light and Actual Malice.**

Likewise, Plaintiff's false light invasion of privacy claim, premised on precisely the same factual allegations, must be dismissed as a matter of law.  See *Susko*, 2008 U.S. Dist. LEXIS 69901 (N.D. W. Va. 2008).  West Virginia recognizes false light as a distinct tort that requires proof of a defendant's public disclosure of private facts about the plaintiff where the disclosure is highly offensive and objectionable to a reasonable person and the public has no legitimate interest in the facts disclosed.  *Id.* at *16 (emphasis added).  False light claims typically arise in cases where a plaintiff's photo is depicted in connection with some facts to which he has no

connection.  *See Crump*, 173 W. Va. at 716.  As a matter of law, absent a showing of actual malice, there can be no false light liability for dissemination of facts that are "newsworthy" or of "public interest."  *Curran v. Amazon.com, Inc.*, 2008 U.S. Dist. LEXIS 12479, *25-26 (S.D.W. Va. 2008).  Newsworthiness depends upon a logical nexus between the plaintiff and the facts disclosed and public interest encompasses current events.  *Id.* at *27-29.

In this case Plaintiff's claim for false light must fail as a matter of law.  There can be no question but that Sinclair's report was newsworthy and of public interest as it described an official government investigation into allegations of abuse at Barboursville's only licensed daycare.[17]  As described at length above, news of the DHHR investigation into Kim's Kids prompted by the Mother's allegations was accurate and truthful.  Plaintiff has presented no evidence, much less clear and convincing evidence, that Sinclair acted with actual malice.  Therefore, Plaintiff's false light claim must fail as a matter of law.

### C.    Plaintiff's Claims for Emotional Distress Fail as a Matter of Law.

For the numerous reasons stated above, Plaintiff's defamation claim against Sinclair must fail as a matter of law.  Therefore, her claims for intentional infliction of emotional distress must also be dismissed because it is merely derivative of the defamation claim.  *Hustler Magazine v. Falwell,* 485 U.S. 46 (1988).  In *Hustler*, the United States Supreme Court described the fundamental importance and essential nature of free speech that must not be hindered by governmentally imposed sanctions.  *Id.* at 51.  A plaintiff may not avoid the onerous burden that the First Amendment places on speech related claims by merely reframing the same facts as a claim for intention infliction of emotional distress.  *Id.* at 56.  In this case, Plaintiff's intentional

---

[17]    Additionally, the report shed no false light upon Plaintiff as she was depicted opening the door to the Daycare she owned.  Just as Plaintiff cannot maintain a claim for false light in this case, nor could Kim's Kids because corporations, partnerships and unincorporated associations have no personal right to privacy.  See *Susko*, 2008 U.S. Dist. LEXIS 69901 at *14-15.

infliction of emotional distress claim is merely derivative as it is premised on nothing more than Sinclair's news broadcasts and must, therefore, fail as a matter of law.

Without even reaching the protection of the First Amendment, West Virginia cautions that intentional infliction of emotional distress claims must be kept in hand with firm judicial oversight. *Garrett v. Viacom, Inc.*, 2003 U.S. Dist. LEXIS 21007 (N.D. W. Va. 2003). To recover for intentional infliction of emotional distress, a plaintiff has the burden to prove defendant's atrocious, intolerable, and extremely outrageous conduct and plaintiff's emotional distress so severe that no reasonable person could be expected to endure it. *Id.* at 7-8. In this case, the behavior at issue - a legitimate news broadcast describing an official investigation by DHHR into allegations of abuse at a licensed daycare - does not even come close to the boundaries of outrageousness required to state a claim for intentional infliction of emotional distress. *Id.* at 9-11 (citing "a long line of West Virginia cases" including claims premised on news broadcasts that did not amount to outrageous conduct). The news report of a matter of public interest by the media is ordinary, expected, and, in fact, demanded by the media.

Furthermore, Plaintiff's spurious claim for negligent infliction of emotional distress is untenable on the facts at issue. The law of negligent infliction of emotional distress is intended to compensate a plaintiff for the extreme mental anguish of seeing a loved one critically injured or killed. *Heldreth v. Marrs*, 188 W. Va. 481, 484 (W. Va. 1992); *Brown v. City of Fairmont*, 221 W. Va. 541, 569 (W. Va. 2007). In this case, no facts remotely link Plaintiff's allegations to a meritorious claim for negligent infliction of emotional distress.

## III. CONCLUSION

For all the foregoing reasons, therefore, Defendant Sinclair Media III, Inc., respectfully requests this Court to issue an order dismissing Plaintiff's claims against it in their entirety.

Respectfully submitted,

OF COUNSEL:

Richard M. Goehler (Ohio Bar # 0009160)    /s/ James D. McQueen, Jr.
Patricia A. Foster (Ohio Bar # 0080306)    James D. McQueen, Jr. (WV Bar # 2507)
FROST BROWN TODD LLC           FROST BROWN TODD LLC
2200 PNC Center                        Chase Tower, Suite 1200
201 East Fifth Street                 707 Virginia Street East
Cincinnati, Ohio  45202-4182         Charleston, WV  25301-2705
(513) 651-6711                        (304) 345-0114
(513) 651-6981 (Facsimile)          (304) 345-0115 (Facsimile)

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT HUNTINGTON**


KIM TOMBLIN,                              :        Civil Action No. 3:08-CV-1294
                                         :
          Plaintiff,                      :        Honorable Robert C. Chambers
                                         :
    v.                                   :
                                         :
WCHS-TV8,                                :
                                         :
          Defendant.                      :

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 12, 2009, I electronically filed the foregoing

**Memorandum in Support of Defendant's Motion for Summary Judgment** with the Clerk of

Court using the CM/ECF system which will send notification of such filing to the following

CM/ECF participant:

        Jay C. Love, Esq.
        624 8th Street
        Huntington, WV 25701.


                        /s/ James D. McQueen, Jr.
                        James D. McQueen, Jr. (SBID #2507)


CINLibrary 0115617.0562540 1992272v3

22