IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

### HUNTINGTON DIVISION

KIM TOMBLIN,

                Plaintiff,

v.                            CIVIL  ACTION  NO.  3:08-1294

WCHS-TV8,

                Defendant.

### MEMORANDUM OPINION AND ORDER

Pending are the Defendant's motion for summary judgment (Doc. 19) and motion to strike certain affidavits (Doc. 31).  Because the news report in question was not capable of carrying a defamatory meaning, did not place Kim Tomblin in a false light, and does not meet the test for intentional or negligent infliction of emotional distress under West Virginia law the Court **GRANTS** judgment in favor of the Defendant.   Defendant's motion to strike is **GRANTED** in part and **DENIED** in part.

### Standard of Review

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

Although the Court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his favor[.]" *Anderson*, 477 U.S. at 256.  Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, an evidentiary showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

## Background

This case arises from a July 17, 2006 newscast focused on Kim's Kids Child Care ("Kim's Kids") in Barboursville, West Virginia.  The newscast televised a mother's allegations that her son was abused while under the care of Kim's Kids.  Plaintiff argues, that through this newscast, Defendant falsely insinuated that a worker at her daycare sexually abused a child.  Further, Plaintiff argues, that because footage of her person was part of the newscast, it specifically implied that she herself was the abuser.  Plaintiff contends that prior to the newscast there was never any allegation that she sexually abused a child, no allegation that any worker sexually abused a child, and not even an allegation of conduct properly termed as "sexual abuse."  As a result, Plaintiff has filed the instant lawsuit seeking damages for defamation, invasion of privacy, and intentional infliction of emotional distress.

## I.    Description of the Broadcast

The newscast at issue was aired at 11:00 on WCHS-TV8 ("WCHS"), a local ABC affiliate the night of July 17th.[1]   The broadcast begins with co-anchors Deborah Linz and Rick Lord

---

[1]A nearly identical broadcast appeared at 10:00 p.m. on WVAH Fox11 News.  WCHS was the only named Defendant in this case.   A corporate disclosure made clear that WCHS is owned by
(continued...)

introducing themselves.  Lord then leads into the Kim's Kids story stating " serious allegations of abuse and neglect have the State keeping a closer eye on one Barboursville daycare." (WCHS News Broadcast Tr. Doc. 19, Attach. 3) ("*Transcript*").  He is then joined by reporter Elizabeth Noreika, who begins, "a mother says she's taken her children out of Kim's Kids Child Care center in Barboursville because she says her young son was sexually abused." *Id.*  After a brief statement by the mother, expressing her anger, Ms. Noreika continues, "A woman says this daycare in Barboursville abused her trust and her child." *Id.*  The viewer is left with no doubt that the Barboursville Daycare is Kim's Kids, as the outside of that daycare as well as signs identifying it are displayed during this period of the broadcast.  Equally clear is that the woman referred to is the mother who had just appeared on camera.

After two other short statements by the mother, Ms. Noreika seems to summarize the allegations, stating "she [the mother] alleges that her son was sexually abused while at Kim's Kids Child Care.  She also says that the daycare's workers smoke around children and engage in other inappropriate behavior." *Id.*  At this point the broadcast moves to a picture of Ms. Noreika knocking on the daycare's front door.  A woman, not identified by name, opens the door.  This woman, as it turns out, was Kim Tomblin, director of Kim's Kids and the Plaintiff.  The broadcast notes that

---

[1](...continued)

Sinclair Media III, Inc., which is turn owned by Sinclair Communications LLC, which is in turn owned by Sinclair Television Group, Inc. , which is in turn owned by Sinclair Broadcast Group Inc. In memoranda, Defendant refers to itself as Sinclair Media III, Inc.  It has submitted transcripts of broadcasts on both WVAH and WCHS (which are nearly identical) and clearly intends to offer a defense for both stations.  As the named Defendant in this case is WCHS, the Court will continue to use that nomenclature and refer only to that station.  As the broadcasts aired on each station are virtually identical, however, the reasoning of this opinion applies equally to the story broadcast on WVAH.

workers at the daycare denied the allegations made against them but did not want to appear on camera.

At this point, the newscast turns to the substance of a state Department of Health and Human Resources ("DHHR") investigation on the subject. Ms. Noreika states, "[a] spokesman for the Department of Health & Human Resources says an investigation has only turned up signs of worker inattentiveness, but DHHR says it was enough to close the facility." *Id.* According to the newscast the DHHR later decided to allow Kim's Kids to remain open during the appeal, but did not allow the daycare to accept new children. The mother again appears, and Ms. Norieka comments that this mother wants the daycare shut down. The entire newscast is just over two minutes long.

Plaintiff's arguments about the false nature of the newscast rest on differences between it and the DHHR report. The parties agree that Ms. Noreika was familiar with the contents of the report prior to the time the newscast appeared on air. First, the DHHR report does not use the term "sexual abuse" as did the newscast. Rather, the mother's allegations are stated more precisely. As recalled by Ms. Noreika in an affidavit, the mother told the DHHR another boy "touched [her child] inappropriately by sticking his finger into [her child's] rectum and grabbing [her child's] genitals." Aff. of Elizabeth Noreika (Doc. 19 Attach. 1). This quotation likewise reveals the second important distinction between the DHHR report and the WCHS newscast: the mother specified to the DHHR her belief that another child perpetrated the abuse on her child.

Some of the differences between the newscast and the DHHR report are undoubtedly the result of Ms. Noreika's own interview of the mother during the production of the WCHS broadcast. Ms. Noreika stated in her affidavit that it was the mother who stated the opinion that Kim's Kids

-4-

daycare "abused her trust and her child." *Id.* Ms. Noreika contends that she did not embellish or editorialize any facts and that the mother's allegations were accurately reported.

In addition to her statements that she stands by her reporting, Ms. Noreika's also points out that she had close contact with DHHR spokesperson John Law during the production process. She called Mr. Law no less than four times the day the newscast appeared on air. He approved the transcript as read to him over the phone and again after he visited the station and previewed the segment.

Undoubtedly, one of the principal effects of the broadcast was the embarrassment it caused to Plaintiff, Ms. Tomblin. She states in affidavit that she felt it accused her personally of perpetrating sexual abuse on a child in her care. She feels that people in her community shared this interpretation and look at her as an accused child molester. She withdrew from church and other social interactions; she has had trouble sleeping, does not eat well, and has lost weight as a result of these feelings. There is evidence that the news report caused parents to withdraw their children from Kim's Kids, which may have had financial implications Ms. Tomblin.

## II.    Plaintiff's Affidavits in Support

Plaintiff submitted several affidavits along with her memorandum in opposition to summary judgment. These were written by her husband, her mother, two women employed at Kim's Kids at the time of the broadcast, and one parent who withdrew her child.    Most of the affidavits make the same basic points: 1) that Kim Tomblin was happy and healthy prior to the broadcast; 2) that the WCHS newscast gave them the impression that an adult worker at Kim's Kids was accused of sexually abusing a child there; 3) more specifically, because Kim Tomblin appeared in the footage, that Kim herself was accused of the sexual abuse; and, 4) after the broadcast Kim became distraught

and her health deteriorated.  Some of the affidavits also attest that children were withdrawn from the daycare as a result of the broadcasts.

In addition, Plaintiff submitted an opinion from an expert witness - Timothy Saar, Ph.D.  Dr. Saar is a clinical psychologist and Clinical Director of the Saar Psychological Group.  The report states that "current evidence indicates that Mrs. Tomblin did not exhibit any significant mental health impairment, and functioned successfully as a wife, mother, and business owner prior to the broadcast in July of 2008."  (Saar Expert Report Doc. 23 Attach. 2).  He contrasts this past mental state with her current evaluation where Dr. Saar describes Ms. Tomblin as suffering from "acute turmoil."  *Id.*  Dr. Saar explicitly states in his report that he had not viewed the broadcast (although he did read the transcript).  Nonetheless, he opines, "any reasonable person who observed this juxtaposition of Mrs. Tomblin's face and the news article would basically be led to believe that Mrs. Tomblin was sexually abusing the child."  *Id.*  He further elaborates, "any reasonable person would have found Ms. Noreika's report and the WCHS-TV's conduct extremely outrageous and the light which Mrs. Tomblin was portrayed as highly offensive in my opinion no reasonable person could be expected to endure the type of emotional distress that Mrs. Tomblin is suffering as a result of the broadcast."  *Id.*

## Discussion

### I.     Defendant's Motion to Strike Plaintiff's Affidavits in Support and Expert Report

Before tuning to the issues invoked for purposes of summary judgment, the Court must consider and resolve the Defendant's motion to strike.  The motion is principally grounded on Rules 701 and 702 of the Federal Rules of Evidence – respectively dealing with the permissible scope of lay and expert witness testimony.  Rule 701 provides,

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Rule 702 in turn provides,

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The relevant effect of these two rules is to limit opinion testimony. Lay witnesses may only testify to non-technical opinion based upon their personal perceptions and which is helpful to the trier of fact; expert witnesses may offer opinions grounded in facts or data outside their personal experience, but based on the application of reliable principles and methods used in their field of expertise. *See* Fed. R. Evid. 701, 702.

Defendant argues that lay witness testimony presented by plaintiff in affidavits from Kim Tomblin, Billy Tomblin, Sarah Miles, Christy Glover, Ashley Bowen, and Caroline Bennett exceed the bounds of Rule 701 because each opines upon matters outside the scope of their personal perception. These statements, like those from Christy Glover, claim the impression it was a worker – or more precisely Kim Tomblin – who was accused of child sexual abuse: "[t]he broadcast gave the impression, in my opinion, that an adult worker at Kim's Kids child care sexually abused a child.

-7-

. . . Because Kim's face was shown, it was my opinion that the broadcast gave the impression that Kim Tomblin sexually abused a child." Aff. of Christy Glover (Doc. 23 Attach 6).

The Court agrees with the Defendant and finds that these statements must be excluded under Fed. R. Evid. 701. To allow these opinions into evidence would threaten the role of the judge and the jury – they are, therefore, not helpful to the trier of fact. Opinion testimony by a lay witness is generally admissible when the witness cannot adequately communicate to the jury the facts upon which the opinion is based. *United States v. Skeet*, 665 F.3d 983, 985 (9th Cir. 1982). Under Rule 701, "whenever inference and conclusions can be drawn by the jury as well as by the witness, the witness is superfluous, . . . a lay opinion is received because and whenever his facts cannot be so told as to make the jury as able as he to draw the inference.' 7 Wigmore on Evidence (Chadbourn rev. 1978) sec. 1917.8 at 10 (emphasis in original); *see also,* 1 McCormick on Evid. § 12 (6th ed. 2006) ("Undoubtedly some highly opinionated statements by the witness amount to nothing more than an expression of his general belief as to how the case should be decided . . . . There is no necessity for this kind of evidence; its receipt would suggest that the judge and jury may shift responsibility for the decision to the witnesses."). In this case the jury could easily view the broadcast in question and form their own conclusions about its content and message. Witnesses who present conclusory opinions regarding their impressions of the newscast are not helpful. Affidavits containing this type of inadmissible material are hereby **STRICKEN** from the record and will not be further considered by the court in the resolution of this motion or in any other matter. Other statements contained within the affidavit referring to the state of Ms. Tomblin's health or the withdrawal of children from the daycare are admissible.

-8-

Likewise, the Court agrees with the Defendant that the expert report cannot pass the threshold requirements of Rule 702.  Dr. Saar's opinions about viewers' interpretations of a newscast – when he himself has not taken the scant *two minutes* required to watch that newscast – cannot be considered reliable.  Although the Court is not readily familiar with the standards and practices of clinical psychology, it is inconceivable that this kind of comment without foundation would be acceptable in the field.  While Dr. Saar read the transcript of the video, there is no indication he was familiar with the visual images shown during the segment. This is particularly disturbing in the context of opinions that "any reasonable person who observed [the] juxtaposition of Mrs. Tomblin's face and the news article would basically be lead to believe that Mrs. Tomblin was sexually abusing the child" and that the "light in which Mrs. Tomblin was portrayed" was "extremely outrageous . . . highly offensive."  Expert Report of Dr. Timothy Saar (Doc. 23 Attach 2).  For these reasons the Court **FINDS** the expert report of Dr. Saar to be unreliable; the Court **STRIKES** the portions of the report referring to the doctor's impression of the newscast, its effect on a reasonable viewer, and his conclusions that the portrayal of Ms. Tomblin was outrageous and offensive.  The Court does not have adequate grounds to strike the remainder of the report – referring to the condition of Kim Tomblin – and those portions may remain.

## II.      Defendant's Motion for Summary Judgment

Plaintiff's complaint contains counts of defamation, false light invasion of privacy, and both intentional and negligent infliction of emotional distress.  *See* (Pl.'s Compl. Doc. 1 Attach. 3).  As explained below, because Plaintiff cannot demonstrate the requisite element of falsity, her claims for defamation must fail.  Similarly, Plaintiff cannot show that her presence in the contested WCHS

newscast placed her in a false light.  Finally, derivative claims of intentional and negligent infliction of emotional distress must be denied as a matter of law.

    A.    PLAINTIFF CANNOT PROVE AN ELEMENT NECESSARY FOR DEFAMATION – FALSITY

Under West Virginia law, the essential elements for an actionable defamation claim by a private individual are "1) defamatory statements; 2) a nonprivileged communication to a third party; 3) falsity; 4) reference to the plaintiff; 5) at least negligence on the part of the publisher; and 6) resulting injury."[2]  Syl. Pt. 1, *Crump v. Beckley Newspapers, Inc.* 320 S.E.2d 70 (W.Va. 1984).  If allegedly defamatory statements are shown to be true, a plaintiff has failed to make out a *prima facie* case for defamation and the claims must fail.

The determination of truth is a mixed question of law and fact.  The Court's role, as here on summary judgment, is to decide as a matter of law whether the communication was "capable of a

_____

[2]The West Virginia Supreme Court has articulated a different test for public figures, including public office holders or candidates for public office, which incorporates different First Amendment protections under the United States Constitution.  *See e.g.* Syl. Pt. 4. *Chafin v. Gibson,* 578 S.E.2d 361 (W.Va. 2003)

> (A candidate for political office is governed by the same rules with regard to recovery for libel as a public official and can sustain an action for libel only if he can prove that: (1) the alleged libelous statements were false or misleading; (2) the statements tended to defame the plaintiff and reflect shame, contumely, and disgrace upon him; (3) the statements were published with knowledge at the time of publication that they were false or misleading or were published with a reckless and willful disregard of truth; and, (4) the publisher intended to injure the plaintiff through the knowing or reckless publication of the alleged libelous material.)

In this case the Court need not determine whether Ms. Tomblin was a public figure because she has not provided evidence to support a cognizable claim under the more lenient test for a private party plaintiff.

defamatory meaning." Syl Pt. 3, *Dixon v. Ogden Newspapers, Inc.*, 416 S.E.2d 237 (W.Va. 1992). In undertaking its analysis a court should focus on the "gist" or "sting" of the communication. Minor inaccuracies should be overlooked as long as the "substance, the gist, the sting, of the [defamatory] charge be justified." Syl. Pt. 4. *Suriano v. Gaughan*, 480 S.E.2d 548 (W.Va. 1996). It is possible, however, for a defamation action to succeed even when all of the individual statements in a communication are literally true. "Direct defamatory statements are not an absolute prerequisite to recovery . . . because defamation may also be accomplished through inference, innuendo or insinuation." Syl. pt. 4. *Crump,* 320 S.E.2d at 78. In this case, Plaintiff has alleged that Defendant is liable for both direct defamatory statements and innuendo. The Court will first address the allegations of direct defamation, and then defamation by innuendo.

1.    Statements in the WCHS broadcast were all literally true

In her response brief, Plaintiff identifies two statements she contends are direct instances of defamation. First, the statement from the mother that "her young song was sexually abused while at Kim's Kids Child Care." *Transcript.*  Plaintiff claims that this statement is inconsistent with the DHHR investigation which did not use the term "sexual abuse." Throughout her brief Plaintiff refers to the incident in question not as "sexual abuse" but as "inappropriate touching" and contends that the latter is the truthful descriptor of the events in questions. Plaintiff identifies a second statement as direct defamation, also attributed to the mother in the story, that  "this daycare in Barboursville abused her trust and her child." *Id*. Plaintiff contends this statement is factually untrue as only another child at the daycare, and not the daycare as an entity, was accused of abuse,.

Taking these each of these statements in turn, the Court concludes that each is factually accurate and non-actionable as direct defamation. Plaintiff's argument that no sexual abuse

occurred, or that "sexual abuse" is not an accurate descriptor for the events in question is simply without merit. From the DHHR report and discovery it is clear that the mother specifically alleged that another boy stuck his finger in her son's rectum and grabbed his genitals. Clearly, this may be characterized as abuse of a sexual nature. While the DHHR report did not use the term "sexual abuse," it described the alleged incident in detail. Defendant's choice to spare the audience a graphic description of the event and merely describe it in shorthand as "sexual abuse" cannot be taken as a literal falsehood.

The statement of the mother's opinion that "this daycare in Barboursville abused her trust and her child" is also a accurate and not actionable as direct defamation. In deposition, Ms. Noreika stated that the mother "told me her opinion" that the daycare abused her trust and her child. The statement was clearly attributed to the mother and not to the station as the full comment reads, "[a] woman says this daycare in Barboursville abused her trust and her child." Under West Virginia law, "[a] statement of opinion which does not contain a provably false assertion of fact is entitled to full constitutional protection."[3]  Syl pt. 4, *Maynard v. Daily Gazette Co.*, 447 S.E.2d 293 (W.Va. 1994);

---

[3]In their briefing the parties quibble over whether this statement is a "fact" or an "opinion." In this Court's view, "opinion" is a more accurate descriptor as the statement is clearly attributed to the mother and clearly reflects her beliefs. The label, however, is not critical. As the West Virginia Supreme Court explained in *Maynard*, "[r]ejecting the opportunity to require courts a preliminary inquiry into whether a statement is 'opinion' or 'fact' the [U.S. Supreme Court] concluded that 'breathing space,' which '[f]reedoms of expression require in order to survive' is adequately secured by existing constitutional doctrine without the creation of an artificial dichotomy between 'opinion' and 'fact.'"  *Maynard v. Daily Gazette, Co*., 447 S.E.2d 293, 296 (W.Va. 1994) (quoting *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 772 (1986)). The critical test of truth of falsity is simply whether a statement asserts the truth or asserts a falsehood. The statement that "[a] woman says this daycare in Barboursville abused her trust and her child" is literally true if the woman actually spoke the words attributed to her. In this case, evidence shows that she did. Of course, these words could also be actionable as part of false innuendo in certain circumstances. The Court explains those circumstances and analyzes the potential for defamation by implication

(continued...)

-12-

*see also, Hinerman v. Daily Gazette*  423 S.E.2d 560, 577-78 (W.Va. 1992) (explaining that the author of an article may recite their own opinion or give a fair abridgment of the opinion of another without fear of liability).  From the evidence it appears quite simply that a mother told reporter Elizabeth Noreika that she felt a daycare abused her trust and her child and Ms. Noreika reported truthfully, "[a] woman says this daycare in Barboursville abused her trust and her child."

Plaintiff argues that the mother could not have literally meant that the *daycare* abused her child and that Ms. Norieka must have known the mother's meaning because the incident as alleged in the DHHR report – provided to Ms. Noreika by the mother – was between two chldren.  It is undisputed that Ms. Noreika knew the details of the allegation as stated in the DHHR report.  This fact, however, does not create falsity in either the broadcast statement or the mother's opinion.  The newscast itself correctly stated that the DHHR found signs of worker inattentiveness which were sufficient to temporarily close the facility.  Although the DHHR report itself did not confirm the occurrence of sodomy or genital grabbing between two children, it noted that as a result of improper supervision "the possibility that such an incident could occur is likely." State of W.Va. DHHR Investigation of Abuse or Neglect in Child Care Agency (Doc.19 Attach. 2).  In deposition, a DHHR representative, Laura Sperry, indicated that the proper level of supervision at a daycare is considered "eyes-on." This standard requires "observation, oversight, and guidance of the individual child or groups of children, by the staff member. . . close enough to intervene, if necessary, to protect the child from harm."  W.Va. CSR § 78-1-3.2.  Under this standard, it is the daycare's responsibility to prevent abuse of the type alleged by the mother.  The mother's opinion that the daycare violated its

---

[3](...continued)
in the next section.

duty under DHHR regulations and was responsible for the abuse which occurred is not demonstrably false and not actionable as direct defamation.

>    2.    There is nothing in the broadcast to evince and endorsement of false implication or innuendo

As the Fourth Circuit Court of appeals noted, a plaintiff asserting defamation by implication must meet a high standard.

> A defamatory implication must be present in the plain and natural meaning of the words used. Moreover because the constitution provides a sanctuary for truth, a libel-by-implication plaintiff must make an especially rigorous showing where the expressed facts are literally true. The language must not only be reasonably read to impart the false innuendo, but it must also affirmatively suggest that the author intends or endorses the inference.

*Chapin v. Knight-Ridder Inc.*, 993 F.2d 1087, 1092-93 (4th Cir. 1993) (citing *White v. Fraternal Order of Police*, 909 F.2d 512 (D.C. 1990) (other citations omitted)). Although the *Chapin* court was interpreting Virginia law, the constitutional protections it spoke of were those of the United States Constitution and the pronouncement is consistent with West Virginia law, which recognizes both a privilege of fair comment and fair report of public proceedings relevant to public concern. *Hinerman,* 423 S.E.2d 577-78. The pertinent question is not simply whether a viewer might infer a defamatory message, but whether a viewer would infer a defamatory message and then attribute his inference to some intention or endorsement of the broadcastor. In other words, as explained by the D.C. Circuit in *White,* "the court must first examine what defamatory inferences might reasonably be drawn from a materially true communication, and then evaluate whether the author or broadcaster has done something beyond the mere reporting of true facts to suggest that the author or broadcaster intends or endorses the inference." *White,* 909 F.2d at 520.

-14-

When taken as a whole, the newscast at issue in this case cannot be said to contain an endorsement or intention of false innuendo. First and foremost, it was a fair and accurate report based on the source material available.  Although Plaintiff vigorously contends the news report would carry a much different message if another child was identified as the direct perpetrator of abuse, this was not the focus of either the mother's allegations or the DHHR report.  The mother clearly focused her outrage on the daycare, not on another child who may have directly engaged in the abuse.  Likewise, the report of the DHHR investigation focuses its attention on the daycare and does not even name the child who was accused of perpetrating the abuse.  Consistent with its source material, the WCHS newscast focused not on the other child – but on the daycare.

Further, during the entirety of the broadcast, all of the mother's statements and allegations are clearly attributed to her and her alone.  Although she clearly holds strong beliefs about what occurred at Kim's Kids daycare and who is responsible, it is equally clear that those opinions are hers and not those of the WCHS newscasters.  Reporter Noreika and the news anchor at WCHS are careful to refer to the mother's statements as "allegations" rather than facts.  At no time during the broadcast does anyone affiliated with WCHS provide his or her own opinion on the matter.  Instead, the broadcast attempts to provide two sides to the story by airing the daycare's statement that "any and all allegations aren't true." *Transcript.*  Ms. Noreika also attempted to explain the facts known about the incident through the DHHR investigation.  These facts included that the investigation had "only turned up signs of worker inattentiveness" and that while the DHHR initially closed the daycare the agency later consented to its remaining open during appeal. *Id.*  While some viewers might have incorrectly assumed that the direct perpetrator of the alleged abuse was an adult, it was not reasonable to conclude that the news report created or endorsed this assumption.

-15-

Throughout her response, Plaintiff contends that WCHS's omission of information regarding the age or identity of the direct perpetrator of the abuse was enough to evince an intention or endorsement of innuendo. She relies heavily on two cases – *Schiavone Construction Co. v. Time Inc.,* 847 F.2d 1069 (3d Cir. 1988) and *Hinerman v. Daily Gazette Co., Inc.*, 423 S.E.2d 560. *Schiavone Construction* centered on an article run in the midst of an FBI investigation of former U.S. Secretary of Labor Raymond Donovan. *See generally, Schiavone Construction*, 847 F.2d 1069. One of Donovan's former business partners, Ronald Schiavone, filed suit on behalf of himself and Schiavone Construction, which he had formerly owned in conjunction with Donovan. *Id.* at 1072. Relying on a leaked FBI memorandum from former chief William Webster, the Time article stated "the name of Schiavone appeared several times in the bureau's reports on the 1975 disappearance of former Teamster Boss Jimmy Hoffa." *Id.* The Time article, however, left out an exculpatory statement contained within the FBI source memo that "none of these [appearances in the Hoffa execution files] suggested any criminality, or organized crime associations." *Id.* (brackets in original). Instead, the author included the suggestion that the appearance of Schiavone's name in the Hoffa files "would surely have intrigued both the Senate committee that approved Donovan's nomination in February 1981, and the special prosecutor this year." *Id.* The Third Circuit Court of Appeals denied summary judgment to the defendant finding that the deliberate exclusion of exculpatory material combined with the author's own suggestive comments was enough to create a defamatory meaning and exceed the bounds of fair reporting.[4] *See generally, id.*

---

[4]Much of this analysis appears in the section of the *Schiavone* opinion analyzing the fair reporter privilege and evidence to support actual malice. *See* 1085-93. These are the sections of the case relied upon by Plaintiff in making her arguments. The section of the *Schiavone* opinion addressing falsity was dependant upon the evidentiary details of the case. *See id* at 1083-84. Time

(continued...)

The *Hinerman* case involved an editorial piece in a Charleston, West Virginia, newspaper, the Daily Gazette, harshly critical of one of the members of the state bar. *See generally*, *Hinerman*, 423 S.E.2d 560. The editorial was based on a petition to the West Virginia Supreme Court to review a grant of default judgment against a client sued by his attorney for the nonpayment of fees. *Id.* at 565-66. The Gazette article described the appeal as involving "a sick immigrant miner who won disability payments, but his lawyer took every penny, getting $12,000 for one day's work." *Id.* at 566. It went on to criticize the circuit judge who had granted default judgment as someone who had "once hosted a party at which crooked lawyers under prison sentence or indictment were hailed as heroes." *Id.* The article ended with the suggestion that the state ethics commission ask "why she allowed a lawyer to take all the public money granted to an impoverished ex-miner too sick to work." *Id.*

In affirming a lower court jury's assignment of liability and damages for libel the court found that article 1) contained false statements; 2) omitted any exculpatory information; and, 3) used innuendo to suggest that the author had access to facts supporting the allegations contained within the court petition. The statement in the article that the lawyer "took every penny" of the miner's disability award was factually untrue, and if this was not apparent to the Gazette author and editors

---

[4](...continued)
magazine presented evidence that the names of Schiavone and Schiavone Construction appeared in some of the FBI Mafia files. *Id.* at1084 n.2. The FBI, however, provided evidence that the name *Schiavone* did not appear specifically in the Hoffa execution files, as reported by the Time article. *Id.* The court left it to a jury to determine whether the "sting" of the article was general ties to the Mafia or the more specific connection to the Jimmy Hoffa disappearance. *Id.* In denying summary judgment on the element of falsity the court was also swayed by Time's request for additional discovery. The court noted, "[w]e are not necessarily persuaded that this question must ultimately go to the jury. Nevertheless at this stage of the proceedings, without the additional discovery Time claims that it needs, we believe summary judgment is premature on this question." *Id* at 1085.

it should have been.  An article run in the Gazette itself just a few days prior had correctly reported

that the client received a permanent and total disability payment and that the garnishment of benefits

would occur only until the lawyer's bill had been paid.  *Id.* at 567.  The petition itself contained this

and other exculpatory information, including details of the fee arrangement.  *Id.* at 567-69.  Finally,

the court determined that both the insertion of accusatory information about the circuit court judge

and the suggestion that the ethics commission examine the matter carefully suggested that the

article's author had access to undisclosed facts tending to support the petition and a finding that the

lawyer engaged in unethical behavior.  *Id.* at 568-69.  The court explained,

> A regular news account that sets forth pleadings-notwithstanding that they are entirely one-sided-gives at least some notice to the reader that unsubstantiated allegations are being reported. Similarly, an article appearing on the editorial page that is derogatory, derisive or generally abusive, without alleging or implying any supporting facts, gives fair warning that the article is simply the editorial writer's opinion. However, when unsubstantiated allegations are so combined with strongly partisan opinion that the reader is led to believe that the editorial writer has access to undisclosed defamatory facts that lead him to believe the allegations he is reporting from a court proceeding are correct, the bounds of permissible behavior are overstepped.

*Id.*

Both *Schiavone* and *Hinerman* are distinguishable from the case at hand, and largely for the

same reasons.  In each case, the defendant selectively picked sections of source material to create

an  unsupported insinuation, and deliberately omitted exculpatory information within that same

material.  The carefully crafted insinuation was then furthered by a policy suggestion of the article's

author implying that they endorsed such an insinuation and, as found by the *Hinerman* court, had

additional undisclosed facts to support it. In contrast, the WCHS newscast on Kim's Kids Daycare began with a recitation of a mother's allegations. Although it left out specific details of the abuse, it was an accurate portrayal of the mother's opinions and feelings about the incident – which were directed at the daycare itself and not another child. The story then noted the daycare's position – a denial of all allegations – which constituted exculpatory information. It examined the available facts from a DHHR report, which provided additional exculpatory information. Ms. Noreika reported that although the daycare had initially been closed based on findings of worker inattentiveness, it had been allowed to reopen and was working closely with the DHHR. Unlike the articles at issue in *Schiavone* and *Hinerman*, the WCHS news-team refrained from interjecting their own opinions or suggestions for resolution of the matter.

As a fair and accurate representation of the mother's allegations and opinions, the daycare's response and the results of the DHHR investigation, the WCHS news broadcast is not capable of carrying a defamatory meaning. The WCHS news team presented as balanced a perspective as was required on the available information. They did nothing throughout the broadcast to insert their own opinions or endorse those of any subject in the story. As a result, any assumption which may have existed in the mind of a viewer was not the result of an improper insinuation or allegation and is not actionable. The Court **DENIES** the Plaintiff's claims for defamation as a matter of law.

> B.     THE USE OF KIM TOMBLIN'S IMAGE IN THE WCHS BROADCAST DID NOT PLACE HER IN A FALSE LIGHT.

Plaintiff claims that by showing her image in a news story about sexual abuse, Defendant paced her in a false light and insinuated that she herself was the direct perpetrator or such abuse. This claim rests almost entirely on one case decided by the West Virginia Supreme Court – *Crump v. Beckley Newspapers, Inc.*, 320 S.E.2d 70 (W. Va. 1984). Sue Crump, the plaintiff, sued the

newspaper after her picture appeared next to a story about women coal miners who suffered maltreatment at the hands of their male counterparts.  *Id.*  Two years earlier Ms. Crump had consented to have her picture taken for another, more general, article about women coal miners – but neither consented to the use of her picture in the later story nor was mentioned in the story itself. *Id.* at 75.  (In fact it appears that Ms. Crump was quite happy with her job as a miner and had not complained of any mistreatment).  *Id.*  In describing the cause of action the court noted that it often occurred when one's photograph was used "to illustrate an article or book with which the person has no reasonable connection, and which places the person in a false light."[5]  *Id.* at 86.  The court further noted that as in a defamation action, the message created by the juxtaposition of photograph and story must be untrue. *Id.* at 87.  In *Crump*, the court decided that it was a question of fact for the jury whether the juxtaposition of Ms. Crump's picture with the article created an implication that Ms. Crump herself suffered harassment in the course of her employment.  *Id.* at 90.

The false light cause of action as set forth in *Crump* is inapplicable to the case at hand. Unlike Ms. Crump, or any of the other plaintiffs in cases cited by the *Crump* court, Ms. Tomblin had

---

[5]The court had earlier explained that libel could occur through the use of photographs as well as written communication. *Id.* at 80.  During that explanation, the court cited the example of *Wandt v. Hearst's Chicago American*, 109 N.W. 70 (1906), where a paper mistakenly included the plaintiff's picture next to a story about a "suicide fiend" to which the plaintiff had no connection *Id.*  The Wisconsin court had found that this juxtaposition was actionable just as if the defendant had published a statement identifying the plaintiff as a "suicide fiend."  *Id.*

In this case Plaintiff's response brief may be read to rely on *Wandt* and in turn *Crump* to support her defamation claim as well as her claim for false light invasion of privacy.  Although these two causes of actions have divergent roots and seek to remedy different harms, the elements of defamation through false juxtaposition of a photograph and false light invasion of privacy are fundamentally the same.  *See Crump,* 320 S.E.2d at 87-90.  To the extent Plaintiff relies on the appearance of her image in the WCHS news story as a basis for defamation, it fails for the same reasons as her false light invasion of privacy claim.  Namely, because she had an actual connection to the story and was fairly portrayed.

a clear connection to the story.  Generally, it was her daycare that was accused of abuse, but, more importantly, it was she who opened the door when Ms. Noreika asked for the daycare's side of the story.  In fact, the only time Ms. Tomblin appears in the newscast is when she is shown opening the door to Kim's Kids.  The following dialogue can be heard:

> [Ms. Noreika]: My name's Elizabeth and I'm with Channel 8.  And we were wanting to talk with someone who worked here about some allegations that were made against the daycare.
>
> [Unidentified Woman]: Sure.

*Transcript.*  Ms. Noreika then explains, "workers wanted the camera turned off, saying any and all allegations aren't true." *Id.*  The duration of the Ms. Tomblin's presence on camera is a few seconds at most and does not extend into portions of the story stating the mother's opinions and allegations. Ms. Noreika stated in affidavit that this portion of video was intended to show the reporter's attempt to get both sides of the story.  This is a legitimate connection, and a valid message for the news organization to send to its viewers.  There is nothing in the broadcast to suggest that this woman who opened the door played a larger role in the allegations, further distinguishing this case from *Crump*, where the plaintiff's picture was the only image next to a complete article.   The Court **FINDS** that a reasonable juror could not conclude that Ms. Tomblin's brief appearance opening the door to her daycare created an implication that she herself was the alleged perpetrator of sexual abuse.

      C.     PLAINTIFF'S CLAIMS FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AND NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS ARE DERIVATIVE OF HER OTHER CLAIMS AND MUST LIKEWISE BE DENIED.

In West Virginia, to state a *prima facie* case for intentional infliction of emotional distress, a plaintiff must show the following:

> (1) that the defendant's conduct was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency; (2) that the defendant acted with the intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain emotional distress would result from his conduct; (3) that the actions of the defendant caused the plaintiff to suffer emotional distress; and (4) that the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.

Syl. pt. 2 *Philyaw v. Eastern Associated Coal Corp.*, 633 S.E.2d 8 (W.Va. 2006). While a claim for negligent infliction of emotional distress obviously does not contain an element of intent, it is applicable only to limited situations "premised on conduct that unreasonably endangers the plaintiff's physical safety or causes the plaintiff to fear for his or her physical safety." *Brown v. City of Fairmont,* 655 S.E.2d 563 (W.Va. 2007).

To allow Plaintiff's claims for emotional distress to go forward, the Court would have to find that a legitimate, non-defamatory news story was "atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency;" further that Defendant either intended to inflict emotional distress, endangered the plaintiff's physical safety, or caused the plaintiff to fear for her physical safety. Such claims cannot be squared with the earlier findings of this Court on Plaintiff's claims of defamation and false light invasion of privacy. As Plaintiff's claims for infliction of emotional distress are derivative of her earlier claims, they too must be **DENIED** as a matter of law. The Court **FINDS** that Plaintiff has failed to state a *prima facie* case for either intentional or negligent infliction of emotional distress.

**CONCLUSION**

For the reasons explained above the Court **GRANTS** Defendant's motion for summary judgment (Doc. 19) and **GRANTS in part** and **DENIES in part** Defendant's motion to strike (Doc. 31). The Court **DIRECTS** the Clerk to send a copy of this written Opinion and Order to counsel of record and any unrepresented parties.

ENTER:    January 21, 2010

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE

-23-